IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| YAFENG ZHU & SHUHUI ZHANG, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:24-CV-908-MAB |
| | ) | |
| KEELEY & SONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on Defendant Keeley & Sons, Inc.'s *Daubert* Motions seeking to exclude the expert reports, testimony, and opinions of Michelle Albers (Doc. 145), Dr. Richard Bowman (Doc. 146), and Dr. Helena Breuer (Doc. 148). For the reasons set forth below, Defendant Keeley's *Daubert* Motions are DENIED (Docs. 145, 146, 148).

BACKGROUND

Plaintiffs Yafeng Zhu and Shuhui Zhang filed this action in March 2024 for damages stemming from a motor vehicle accident that occurred in April 2022 (*see* Doc. 1).[1] Specifically, Plaintiffs allege that at approximately 12:21 a.m. on April 1, 2022, Plaintiff Zhu was traveling westbound on a two-lane section of Interstate 70 in Bond County, Illinois, as part of his employment (Doc. 78 at p. 6). The right lane of the highway contained markings for ongoing construction, but no construction work was being performed at that time (*Id.*). At or near milepost 37.6 westbound, there was a manmade

---

[1] For a more detailed recollection of Plaintiffs' allegations and the history of this case, see the Court's Orders dated March 12, 2025, and January 23, 2026 (Docs. 111, 134).

pothole (i.e., a cutout) that was only marked by cones in the right lane (*Id.*). According to Plaintiff, however, the pothole protruded into the left lane without any signs or cones signifying the full length of the protrusion (*Id.*). As a result, Plaintiff Zhu's vehicle crashed into the manmade pothole, causing the vehicle to flip onto its side and Plaintiff Zhu to suffer severe injury and expense (*Id.* at pp. 7-8).

Several months after filing this action, Plaintiffs filed a First Amended Complaint that no longer raised claims against Defendant Stutz Excavating (Doc. 63; *see also* Docs. 57, 61). Plaintiffs then filed the operative Second Amended Complaint in August 2024 in response to the Court's Jurisdictional Order (Doc. 78; *see also* Doc. 75). Thereafter, discovery commenced and Plaintiffs ultimately settled or dismissed their claims against all Defendants other than Defendant Keeley & Sons, Inc. (*see* Docs. 104, 108, 154, 165).

Accordingly, this matter is proceeding solely on Plaintiffs claims raised against Defendant Keeley & Sons, Inc. (hereinafter, "Defendant Keeley" or Defendant) (*see* Doc. 165 at p. 2). Meanwhile, on February 10, 2026, Defendant Keeley filed three *Daubert* motions seeking to exclude the expert reports, testimony, and opinions of Michelle Albers (Doc. 145), Dr. Richard Bowman (Doc. 146), and Dr. Helena Breuer (Doc. 148). On March 9, 2026, Plaintiffs filed responses in opposition to each of those respective motions (Docs. 155, 156, 157).[2]

---

[2] Each of Defendant Keeley's motions and Plaintiffs' responses attached supporting exhibits, including expert reports, deposition transcripts, and resumes (*see generally* Docs. 145-1, 145-2, 146-1 to 146-4, 148-1 to 148-5, 155-1 to 155-4, 156-1 to 156-4, 157-1). The Court's discussion will summarize and address these records as appropriate.

### EXPERT TESTIMONY STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (Explaining that although *Daubert* interpreted a prior version of Rule 702, "it remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702."); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (stating that even when a federal court's jurisdiction rests on diversity, *Daubert* and Rule 702 govern the admissibility of expert witness testimony). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Similarly, "*Daubert* requires the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the

task at hand." *Krik*, 870 F.3d at 674.[3] "Although this places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). Consequently, the Court's inquiry must focus upon the principles and methodology employed by the expert. *Id.* "In other words, the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis in original).

In conducting that inquiry, district courts possess broad discretion in determining the relevance and reliability of expert opinion testimony. *Krik*, 870 F.3d at 674. Specifically, when determining the reliability of a qualified expert's testimony under *Daubert*, the Seventh Circuit has directed courts "to consider, among other things: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Id.* (internal quotation marks and citation omitted). Likewise, as it relates to relevance, the ultimate question is whether the qualified expert's specialized knowledge

---

[3] Furthermore, the principles set forth in *Daubert* apply equally to non-scientific fields. *See Manpower*, 732 F.3d at 806; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that a district court's gatekeeping obligation applies to all expert testimony).

will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting FED. R. EVID. 702(a)).[4]

"The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the standard by a preponderance of the evidence." *Krik*, 870 F.3d at 673. Ultimately, however, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### DISCUSSION

Defendant Keeley's *Daubert* motions seek to exclude the expert reports, testimony and opinions of three of Plaintiffs' experts: Michelle Albers, Dr. Richard Bowman, and Dr. Helena Breuer (Docs. 145, 146, 148). Plaintiffs have filed responses opposing each of Defendant Keeley's respective motions (Docs. 155, 156, 157). The Court addresses each motion in turn.

I.   *Michelle Albers's Expert Opinions (Doc. 145)*

Plaintiffs retained and disclosed Michelle Albers as an expert witness to provide opinions and testimony related to Plaintiff Zhu's employability and loss of earning capacity (*see* Doc. 145 at p. 2; *see also* Doc. 145-1). Defendant Keeley argues that the Court should exclude the reports, testimony, and opinions of Ms. Albers because her expert opinions: (1) are not based on sufficient facts and data; (2) are not based on principles or

---

[4] Additionally, Federal Rule of Evidence 403 "overlays all other evidentiary rules by stating that a court may 'exclude relevant evidence if its probative value is substantially outweighed by the danger of ... unfair prejudice, confusing the issues, [or] misleading the jury.'" *Krik*, 870 F.3d at 674 (quoting FED. R. EVID. 403).

methods reliably applied to the facts of this case; and (3) will not assist the jury (Doc. 145 at p. 4). In response, Plaintiffs contend that Ms. Albers's testimony, opinions, and report meet the threshold requirements of *Daubert* and any further arguments go to the weight of Ms. Albers's testimony, not its admissibility (*see generally* Doc. 155).

As an initial matter, to the extent Defendant Keeley has even raised such a challenge, the Court finds that Ms. Albers is qualified as an expert in the area she will be providing her expert opinions on. *See Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness."). Ms. Albers has a Master of Science degree in rehabilitation psychology from the University of Wisconsin and has obtained numerous licenses and certifications related to rehabilitation counseling and life care planning (*see* Doc. 155-1 at p. 2). In addition, she has practiced vocational rehabilitation counseling for over 27 years, has worked as a vocational and life care planner for over 17 years, and has served as a social security vocational expert since 2004 (Doc. 145-1 at pp. 7-8). Ms. Albers has also served as an expert witness in numerous cases across various state and federal courts (Doc. 155-1 at pp. 4-5). Put simply, the Court finds that Ms. Albers is qualified to offer expert testimony regarding the topics contained in her report (*see* Doc. 145-1).

Defendant Keeley challenges the sufficiency of the facts and data underlying Ms. Albers's opinions, as well as the methodology and reliability of those opinions (*see* Doc. 145 at pp. 8-14). Specifically, Defendant Keeley contends that Ms. Albers's opinions are not the product of sufficient facts and data because, among other things, they were not

personally observed by her, ignored relevant evidence and data, and relied on erroneous assumptions (*Id.* at pp. 8-11). Relatedly, Defendant Keeley contends that Ms. Albers failed to employ her usual methodology in reaching her conclusion (*Id.* at pp. 8-14). The Court is not persuaded by Defendant Keeley's arguments.

Significantly, Ms. Albers's opinions about Plaintiff Zhu's inability to work and lost earning potential were based on sufficient facts and data. Her expert report considered hundreds of documents including dozens of medical and billing records, depositions, tax returns, photographs and videos, and numerous other discovery documents from this case (*see* Doc. 145-1 at pp. 2-7). In addition to relying upon those documents, Ms. Albers based her opinions on the information she obtained from a clinical interview with Plaintiff Zhu and her many years of experience in this field (*Id.* at pp. 8-20). Frankly, it does not appear that Defendant Keeley is arguing that those documents are necessarily insufficient to reach Ms. Albers's conclusions. Instead, Defendant Keeley appears to be arguing that Ms. Albers's analysis and opinions failed to consider other relevant evidence such as Plaintiff Zhu's tax returns, and failed to conduct standardized testing or a work inventory assessment (*see generally* Doc. 145). Neither of these contentions hold weight.

For one, Ms. Albers explained that Plaintiff Zhu's tax returns in the years preceding the accident were not particularly useful in identifying his income at the time of the accident because they were filed jointly with his wife, he was self-employed as an owner operator, and he only recently began his employment with his current company (Doc. 145-2 at pp. 23:12-25:6). Consequently, Ms. Albers instead looked at both the median wage of truck drivers "with commensurate experience to demonstrate his

earning capacity" and also considered the pay he was to receive per mile, which she believed provided an accurate representation of his earning capacity (*Id.* at pp. 24:1-11 & 27:1-24). *See, e.g., Owens v. Natl. Collegiate Athletic Assn.*, No. 11 C 6356, 2022 WL 2967479, at *9 (N.D. Ill. July 27, 2022) ("Given the general soundness of his methodology, however, Dr. Scott's decision to use national averages versus more particularized data also goes to weight."). Accordingly, rather than simply failing to consider pertinent facts and data, Ms. Albers did consider that data and adequately explained why she did not rely on it.

Similarly, Ms. Albers explained why she did not conduct standardized vocational testing or other assessments such as a work inventory. For the former, she explained that standardized vocational testing would not have been viable because of Plaintiff Zhu's inability to read or write English and the inability to effectively translate the test to Mandarin (*see* Doc. 145-2 at pp. 54:14-56:22). For the latter, she provided several additional reasons for not conducting certain assessments (such as a work inventory assessment) including the fact that Plaintiff Zhu was almost 55 years old, did not speak English, and was hindered by the physical and mental limitations found by his doctors (*see* Doc. 145-2 at pp. 54:14-63:21).

Defendant Keeley next contends that Ms. Albers failed to rely on personal observations of Plaintiff to reach her opinions (*see* Doc. 145 at p. 11). This argument merits little discussion. Ms. Albers conducted a clinical interview of Plaintiff Zhu, relied on the depositions of Plaintiff Zhu and his family (*see generally* Doc. 145-1), and also relied on the medical records and findings of Plaintiff Zhu's doctors. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (Holding that "there is nothing objectionable

about an expert relying upon the work a colleague."). Ultimately, the Court finds that Ms. Albers relied on sufficient facts and data to reach her conclusion. The challenges raised by Defendant Keeley "goes to the weight and not the admissibility of [her] testimony." *Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 601 (E.D. Wis. 2019).

Next, Defendant Keeley argues that Ms. Albers's testimony should be excluded because she did not follow a reliable methodology, and thus "the opinions included in her report are unreliable because they amount to mere speculation or conjecture." (Doc. 145 at p. 11). To the extent this argument is distinguishable from Defendant Keeley's prior argument, it too fails because the methodology Ms. Albers used to reach her conclusions is sufficiently reliable to satisfy *Daubert*.

That is, Ms. Albers indicated that she relied upon the RAPEL Model and the Vocational and Rehabilitation Assessment Model (VRAM) to reach her conclusions (*see* Doc. 145-1 at pp. 20-21). While Defendant Keeley contends that Ms. Albers merely explained what those methods entail, without also explaining how they were applied in this case, the Court does not believe that to be true. Rather, Ms. Albers's report demonstrates how she applied those accepted methodologies to the facts of Plaintiff Zhu's case (*see generally* Doc. 145-1). *See also Teresko v. The 3M Co.*, No. 22-CV-1532-JPS, 2024 WL 2864402, at *17 (E.D. Wis. June 16, 2024) (Finding the RAPEL and VRAM "methodologies are both reliable."). Ms. Albers's report explains the factors and evidence she considered, the methods she applied, and the conclusions she reached based on that information and her experience (*see* Doc. 145-1). And, as was discussed above, in the instances where Ms. Albers did not perform certain tests that she otherwise may have

conducted, she provided adequate explanations for her decisions. Nothing further was required and Defendant Keeley's specific challenges are more appropriately reserved for cross-examination. *See Narkiewicz-Laine v. Doyle*, No. 11 C 1826, 2017 WL 11889310, at *7 (N.D. Ill. Sept. 13, 2017) (Criticisms of specific aspects of an expert witness's methodology and resulting opinion "go more to the weight the jury should give these opinions, rather than their admissibility."); *Huckaba v. CSX Transportation, Inc.*, No. 13-CV-0586-MJR-PMF, 2014 WL 12139079, at *6 (S.D. Ill. Aug. 6, 2014) ("Tabak's methodology is not flawed. Her failure to deduct x or to consider y is fertile ground for cross-examination by defense counsel, which should shine light on any areas of potential confusion."); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.") (internal quotation marks and citation omitted).

Finally, Defendant Keeley argues that Ms. Albers's testimony and report should be excluded because her opinions would not assist the trier of fact due to the lack of data underlying her opinions and errors or inconsistencies in her methodology (Doc. 145 at pp. 14-15). The Court has already rejected Defendant Keeley's data and methodology arguments above. Thus, all that is left is to determine whether Ms. Albers's opinions may be helpful to the jury. Suffice to say, the Court believes Ms. Albers's expert opinion as to

lost earning capacity would be relevant and helpful to the trier of fact in determining damages, if applicable. In fact, the difficulties in determining Plaintiff's earnings due to the lack of individual tax returns and his relatively recent employment at the time of the incident only further demonstrate the relevance and potential utility of having expert testimony on this topic. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) ("However, under Rule 702, expert testimony need only be relevant to *an* issue in the case; it need not relate directly to the ultimate issue.").

For these reasons, the Court DENIES Defendant Keeley's Motion to Exclude Expert Reports, Testimony and Opinions of Michelle Albers (Doc. 145). Defendant Keeley may raise the challenges discussed above through cross-examination, but none of those challenges merit the exclusion of Ms. Albers's expert testimony.

II.    *Dr. Richard Bowman's Expert Opinions (Doc. 146)*

Plaintiffs retained and disclosed Dr. Richard Bowman as an expert to develop a disability evaluation and life care plan (*see* Doc. 146 at pp. 2-3, Doc. 156 at p. 6). Defendant Keeley argues that the Court should exclude the reports, testimony, and opinions of Dr. Bowman because they are not based on sufficient facts and data, they do not have a reliable basis in applied principles and methods within the field of life care planning, and they will not assist the jury (Doc. 146 at p. 4). In response, Plaintiffs contend that Dr. Bowman's testimony and report meet the threshold requirements of *Daubert* and any further arguments raised by Defendant Keeley go to the weight of Dr. Bowman's testimony, not its admissibility (*see generally* Doc. 156).

First, the Court finds that Dr. Bowman is qualified as an expert in the area he will be providing his expert opinions on. *See Tuf Racing Products, Inc.*, 223 F.3d at 591 ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness."). Dr. Bowman earned his M.D. from West Virginia University, and he specializes in physiatry (physical medicine and rehabilitation) (*see* Doc. 156-1). In addition, Dr. Bowman has been certified by the World Institute of Pain as a Fellow of Interventional Pain Practice and he has been certified by Capital University School of Law as a Certified Life Care Planner (*Id.* at p. 3). He has also served on the International Commission on Health Care Certification's Certified Life Care Planner Board of Commissioners (*Id.* at p. 4). Accordingly, due to both Dr. Bowman's education and extensive experience in physiatry and life care planning, the Court finds that he is qualified to offer expert testimony evaluating Plaintiff Zhu's injuries and preparing a life care plan based upon those injuries (*see* Doc. 146-1).

Similar to Defendant Keeley's challenges to Ms. Albers, Defendant Keeley makes three primary challenges to Dr. Bowman's report, testimony, and opinions. First, Defendant Keeley argues that Dr. Bowman's evaluation is not supported by sufficient facts and data (Doc. 146 at pp. 8-11). Second, Defendant Keeley contends that Dr. Bowman's evaluation is not based on reliable principles and methods (*Id.* at pp. 12-15). And third, Defendant Keeley avers that Dr. Bowman's evaluation will not be helpful to the jury (*Id.* at pp. 15-16). The Court addresses each of these arguments in turn.

Defendant Keeley first argues that Dr. Bowman's evaluation is not supported by sufficient facts or data. In this regard, Defendant Keeley emphasizes that Dr. Bowman

"did not perform any physical tests or any kind of investigation" into Plaintiff Zhu's capabilities and instead relied on Plaintiff Zhu's subjective self-reporting (*Id.* at p. 9). However, as shown in Dr. Bowman's report, he relied on extensive medical records from Plaintiff Zhu's providers and also evaluated Plaintiff Zhu over Zoom (*see generally* Doc. 146-1). This was permissible and any further arguments challenging Dr. Bowman's reliance on the findings and records of other medical professionals go to the weight of his opinions, not their admissibility. *See, e.g.*, *Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *3 (S.D. Ind. Sept. 5, 2012) ("It is important to note at the outset that a life care planner relies on the opinions of appropriately credentialed individuals to provide identification of treatment and its duration."); *Eliason v. Super. Refining Co. LLC*, No. 19-CV-829-WMC, 2021 WL 4820252, at *6 (W.D. Wis. Oct. 15, 2021) (limiting a nurse lifecare planner's "opinion testimony to that supported by physician recommendations or medical records."); *Paine ex rel. Eilman v. Johnson*, No. 06 C 3173, 2010 WL 749861, at *3 (N.D. Ill. Feb. 25, 2010) ("As elaborated in the Court's Order regarding Defendants' Motion to Bar Capell's testimony, however, Capell is qualified as a rehabilitation expert. As such, he is qualified to provide opinions related to her future medical needs when considering 'the natural trajectory of her condition over a period of years.'").

Notably, after challenging the facts underlying Dr. Bowman's original report, Defendant Keeley has expressed significantly greater concern with a supplemental evaluation and report prepared by Dr. Bowman that altered his projected life care plan for Plaintiff Zhu from the two to three million dollar range to the six-million dollar range (*compare* Doc. 146-1 at p. 23 *with* Doc. 146-1 at p. 36). According to Defendant Keeley, in

making that substantial adjustment, Dr. Bowman "parrot[ed] the conclusions of another retained expert and bas[ed] the needs of the Plaintiff on a conversation with the Plaintiff's wife," which was "not an evaluation based on reliable, first-hand information." (Doc. 146 at p. 10). [5]

Pertinently, while the substantial change in Dr. Bowman's anticipated costs is something that Defendant Keeley can (and presumably will) emphasize when questioning Dr. Bowman on cross-examination, neither the adjusted life care costs in that supplemental report nor Dr. Bowman's reliance on Dr. Wen's report change the fact that Dr. Bowman relied on appropriate treatment records and evaluations to reach his conclusions. "An expert witness must base his testimony on the facts," but there is no requirement that the expert "has to know the facts himself; they can be established by other witnesses and then used as the premise for his testimony. But the facts must somehow be gotten into the record for expert testimony premised on them to be admissible." *Pecoraro v. Walls*, 286 F.3d 439, 446 (7th Cir. 2002). Here, that is exactly what occurred—Dr. Bowman relied on Dr. Wen's treatment and evaluations to make and adjust his opinions. While Dr. Bowman's supplemental changes are undoubtedly fair game on cross-examination, their supplementation doesn't change the fact that Dr. Bowman's reliance on Dr. Wen's evaluations was permissible and based on sufficient facts and data. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) ("Medical

---

[5] Presumably, in referencing "another retained expert," Defendant Keeley is referring to Dr. Wen. Notably, however, the Court has already found that Dr. Wen is a treating physician and not a retained expert witness (*see* Doc. 134). Thus, the Court will not revisit this point or any challenge Defendant has raised herein.

professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions.").[6]

Defendant Keeley next contends that Dr. Bowman's evaluation is not based on reliable principles and methods (Doc. 146 at p. 12). More specifically, Defendant Keeley argues that Dr. Bowman relied exclusively on the conclusions of other medical providers, rather than the underlying data generated by them (*Id.*). Defendant Keeley also argues that Dr. Bowman's predictions fail to account for Plaintiff Zhu's alleged declination of treatment and medication (*Id.* at pp. 12-14). The Court does not find these arguments to be persuasive.

As explained above, medical professionals may rely on the opinions of other medical professionals. *Walker*, 208 F.3d at 588 (7th Cir. 2000) ("Medical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions."). This is particularly true in the area of life care planning because it would be virtually impossible to find an expert life care planner who was qualified to opine on every distinct type of underlying injury.[7] *See Paine ex rel. Eilman v. Johnson*, No. 06 C 3173,

---

[6] Likewise, to the extent Defendant Keeley challenges Dr. Bowman's alleged "picking and choosing" between Dr. Wen and another medical provider, that is also a challenge that goes to the weight of Dr. Bowman's expert opinion, not its admissibility.

[7] As explained in *Hale v. Gannon*,

> It is important to note at the outset that a life care planner relies on the opinions of appropriately credentialed individuals to provide identification of treatment and its duration. The first step in composing a life care plan requires gathering and reviewing all relevant information, including the complete medical records of the client, depositions and interrogatories of the client's doctors, and day-in-the-life videos. A life care planner will also interview the client, her family, and her medical care providers. At the second step, the life care planner then identifies any remaining "holes" in the data and, if needed, follows-up with the client or her medical care providers to gain additional information. Once satisfied that all relevant information has been gathered, at the third step the life care

2010 WL 749861, at *3 (N.D. Ill. Feb. 25, 2010) (Rehabilitation expert's life care plan provided opinions as to "potential needs in particular areas" and was not "specific diagnoses or treatment recommendations in those fields, but rather opinions about what her future medical care might involve on the basis of his review of her medical records and his evaluation of her current condition."). Thus, the Court rejects Defendant Keeley's argument that Dr. Bowman's opinion could only rely on the "data generated" by Plaintiff Zhu's medical providers and not their overall conclusions (Doc. 146 at p. 12). To the contrary, had Dr. Bowman relied solely on the data Plaintiff Zhu's doctors generated, that would have raised much greater concerns as to Dr. Bowman's qualifications and methodology, absent a showing that he was qualified to interpret underlying data from every type of medical field at issue in this case.

Defendant Keeley's challenge related to whether Plaintiff Zhu has and will continue to avail himself of the treatment Dr. Bowman accounted for in his reports is also a question of weight, not admissibility. Admittedly, evidence that Plaintiff Zhu has not, or will not, avail himself of treatment that Dr. Bowman anticipated in his life care plan is something that goes to the weight of Dr. Bowman's plan and cost estimates. However, Plaintiff Zhu's alleged treatment noncompliance does not impact the reliability of Dr. Bowman's methodology. And, in regard to methodology, Dr. Bowman reasonably relied

---

planner "costs-out" the anticipated medical treatment and care indicated by the life care planner's research. A life care planner is not an economist, however, and therefore she indicates the costs of the treatment and care in present-day figures. The actual figure indicated for a specific procedure is unique to the client's geographical area and may be derived from billing records or internet research.

*Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *3 (S.D. Ind. Sept. 5, 2012)

upon medical opinions as to the care Plaintiff Zhu will need and then expanded upon that information by using his expertise to estimate future costs. That is an appropriate methodology for determining Plaintiff's care costs. *Runge v. Stanley Fastening Sys., L.P.*, No. 4:09-CV-130-TWP-WGH, 2011 WL 4903782, at *3 (S.D. Ind. Oct. 14, 2011) ("Consequently, Lampton's testimony and Life Care Plan concerning the costs of placement in a 24–hour care facility are both permissible under Rule 702 because, contrary to Defendant's argument, it is based on sufficient facts (the opinions of Dr. Trexler)."[8]). Any further challenges about Plaintiff's compliance with treatment, both to date and in the future, are challenges to the weight and relevancy of Dr. Bowman's opinions, not challenges to his methodology.

Additionally, the Court finds that, at this time, Dr. Bowman's reports and opinions are relevant and are likely to assist the jury in determining damages. "A life care plan assigning a monetary value to medical treatments prescribed for Plaintiff obviously aides the trier of fact with respect to one determination it must make: the amount of damages." *Hopey v. Spear*, No. 13–CV–2220, 2016 WL 9665159, at *3 (C.D. Ill. Apr. 18, 2016). Plaintiff's alleged failure to avail himself of treatment *could* cast doubt on the relevancy and weight of Dr. Bowman's reports and opinions as to future costs, but the appropriate way to raise those challenges is on cross-examination of Plaintiff Zhu and Dr. Bowman.[9] *See, e.g.,*

---

[8] Significantly, the *Runge* Court did not further assess this question because an Indiana law made it clear that the plaintiff was entitled to the value of 24-hour care, even if it was gratuitously provided to him by family members. *Runge v. Stanley Fastening Sys., L.P.*, No. 4:09-CV-130-TWP-WGH, 2011 WL 4903782, at *3 (S.D. Ind. Oct. 14, 2011).

[9] The Court notes that there may be numerous reasons why Plaintiff has allegedly not yet availed himself of all recommended treatment, from financial concerns to changed conditions and need in the future. *See, e.g., Csikos v. S.M. Constr. & Contracting, Inc.*, No. 18-CV-9598 (VEC), 2022 WL 3211462, at *9 (S.D.N.Y. Aug.

*Guerrero v. Loiacono*, 769 F. Supp. 3d 158, 178 (E.D.N.Y. 2024) (Explaining that the fact that certain care was not recommended does not preclude the need for such care in the future, but then concluding that "Defendants 'can and should press' Dr. Root 'on these claims during cross-examination.'").

Accordingly, the Court DENIES Defendant Keeley's Motion to Exclude Expert Reports, Testimony and Opinions of Dr. Bowman (Doc. 146). Defendant Keeley may raise the challenges discussed above on cross-examination, but none of those challenges merit the outright exclusion of Dr. Bowman's expert testimony.

III.   *Dr. Helena Breuer's Expert Opinions (Doc. 148)*

Plaintiffs retained and disclosed Dr. Helena Breuer as an expert to evaluate the placement of temporary traffic control devices around the pavement cutout that is the subject of this case (*see* Doc. 157 at p. 7; Doc. 148 at pp. 2-3). Defendant Keeley argues that the Court should exclude Dr. Breuer's reports, testimony and opinions because: (1) she is not qualified to provide expert opinions in this case; (2) her opinions are not based on sufficient facts or data; (3) she has not properly applied principals and methods to the facts of this case; and (4) her opinions would not assist the jury (Doc. 148 at p. 4). In response, Plaintiffs contend that Dr. Breuer is qualified to provide her opinions, her opinions, testimony, and report meet the threshold requirements of *Daubert*, and any

---

9, 2022) ("Likewise, the costs of future assistive devices and prescription medications that Plaintiff may require — irrespective of whether Plaintiff currently requires such care — are not so speculative that a physician cannot opine on the likelihood Plaintiff will need such treatment in the future. Defendant can and should press Dr. Carfi on these claims during cross-examination, but a jury could reasonably find that Plaintiff will likely require psychotherapy, medication, or assistive devices in the future, despite not needing such care currently.").

further arguments raised by Defendant Keeley go to the weight of her testimony, not its admissibility (*see generally* Doc. 157).

### a. Dr. Breuer's Qualifications as an Expert

Defendant Keeley first avers that Dr. Breuer is not qualified to provide expert opinions in this case because she lacks sufficient education, training, and experience to offer those opinions (Doc. 148 at p. 9). As Plaintiffs admit, this is Dr. Breuer's "first case as an expert." (Doc. 157 at p. 9). Obviously, however, the Court's inquiry focuses on Dr. Breuer's qualifications and not her experience or lack thereof as an expert witness.

As to her qualifications, Dr. Breuer obtained a master's degree and a bachelor's degree in civil engineering, both of which included a focus in transportation engineering (Doc. 148-1 at p. 3; Doc. 148-2). In addition, she obtained a Ph.D. in civil engineering with a specialization in transportation engineering (Doc. 148-1 at p. 3).[10] Dr. Breuer also completed 280 hours of accident reconstruction-related training approved by the Accreditation Commission for Traffic Accident Reconstruction (*Id.*). Conversely, however, Dr. Breuer does not dispute the fact that she is not a licensed engineer, has not designed a traffic control plan, has not assisted or evaluated the setup of an active traffic

---

[10] When asked if she had specific experience related to traffic control, Dr. Breuer stated:

> Well, I have taken numerous classes that touch on traffic control. I have familiarity with design guidelines and industry standards that support traffic control management, traffic control plans. I have had experience from previous work walking through active work sites and construction and looking at traffic control plans.

(Doc. 148-3 at Tr. 20:3-11).

control plan, and has no prior work experience related to commercial truck drivers in construction zones (*see* Doc. 148-3 at Tr. 17:19-24:17).

The Seventh Circuit has explained that "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). And notably, here the purpose of Dr. Breuer's investigation and report was "to determine if the temporary traffic controls (TTC) at the time of the incident (1) met the requirements outlined in the approved TTC plans, (2) adequately warned road users of hazards created by work activities, and (3) provided adequate positive guidance for drivers to safely navigate the work zone." (Doc. 148-1 at p. 3). Accordingly, given Dr. Breuer's extensive education in civil engineering with a focus in transportation engineering along with her accident reconstruction training, the Court finds that she is qualified and has an adequate foundation to answer the above questions. *See O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2026 WL 579329, at *12 (N.D. Ill. Mar. 2, 2026) ("Nonetheless, [t]he requirement that an expert be qualified by knowledge, skill, experience, education or training should not be viewed as being particularly rigorous, and a witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications.") (internal quotation marks and citations omitted).

Defendant Keeley has also argued that, even if Dr. Breuer is qualified to provide expert opinions on certain transportation related topics, such as passenger vehicles and commercial vehicles at rest, she is not qualified to provide expert opinions for situations involving "extensive interstate construction and commercial vehicles traveling on a busy

interstate." (Doc. 148 at p. 10). However, "[t]he fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). Thus, to the extent Dr. Breuer has greater specialized experience in passenger vehicles or commercial vehicles at rest, as opposed to "commercial vehicles traveling on a busy interstate," that distinction goes to the weight of her expert opinions, not their admissibility. *See id.*; *see also Arrington v. City of Chicago*, No. 17 C 04839, 2022 WL 2105871, at *6 (N.D. Ill. June 10, 2022) ("Even if traffic collisions are not Bauer's specialty, 'a lack of specialization generally affects the weight of the opinion, not its admissibility.'"). Accordingly, the Court finds Dr. Breuer is qualified to offer her expert opinions, and any specific challenges Defendant Keeley has to her qualifications regarding the specific scenario presented in this case may be raised on cross-examination.

### b. *Sufficient Facts and Data*

Defendant Keeley next argues that Dr. Breuer's testimony, report, and opinions should be barred because they are not supported by sufficient facts and data (Doc. 148 at pp. 10-13). More precisely, Defendant contends that Dr. Breuer's report is lacking facts and data because: (1) she never visited the crash site or performed any sort of scene examination; (2) she has no knowledge of how traffic control measures were placed at the end of the construction day; (3) she lacks knowledge as to the reasons for the cutout extension; and (4) her opinions rely on unsupported assumptions (*Id.*). Again, the Court is not persuaded.

For one, even if the Court assumes that there was value in Dr. Breuer visiting the crash site several years after the incident in question,[11] Defendant Keeley's argument improperly presumes that the failure to personally visit the site renders an expert's opinions unreliable. This is an argument that has already been rejected in this circuit on multiple occasions. For example, in *Arrington*, the United States District Court for the Northern District of Illinois stated:

> Plaintiffs emphasize that Bauer did not conduct a site visit, instead relying on photographs and videos, maps, and virtual mock-ups of the intersection, which they claim render his opinions unreliable. But Courts in this district have rejected similar arguments that site visits are "required" elements of accident reconstruction analysis. *See, e.g.*, *Paine ex rel. Eilman v. Johnson*, 2010 WL 749857, at *2 (N.D. Ill. Feb. 25, 2010) (finding expert's accident reconstruction was appropriately founded on traffic collision report, photographs of the vehicle and accident site, and other mechanical and structural information); *Pike v. Premier Transp. & Warehousing, Inc.*, 2016 WL 6599940, at *5 (N.D. Ill. Nov. 8, 2016) (rejecting argument that expert's failure to inspect the scene of the accident rendered opinions unreliable and inadmissible). Any discrepancies between the circumstances in those cases and the situation at bar are tangential—the Court is satisfied that a site visit was not absolutely necessary and that Bauer's methodology rests on sufficient objective evidence to meet the bare foundational requirements for admissibility. To the extent his failure to visit the site around the time of the accident undermines the credibility of his opinions, Plaintiffs are free to cross-examine him on it. *See Paine*, 2010 WL 749857, at *3 (finding that expert's failure to refer to specific pieces of evidence was a factor going to the weight of his conclusion, not its admissibility).

*Arrington v. City of Chicago*, No. 17 C 04839, 2022 WL 2105871, at *7 (N.D. Ill. June 10, 2022).

---

[11] The accident in question occurred on April 1, 2022 (*see* Doc. 78 at p. 3; *see also* Doc. 148 at p. 1). Meanwhile, Dr. Breuer's report is dated July 15, 2025, and she only began working for the firm retained by Plaintiffs in March 2025 (*see* Doc. 148-1; *see also* Doc. 148-2).

Turning to Defendant Keeley's next contention—that Dr. Breuer has no knowledge of how traffic controls were placed at the end of the workday—the Court again finds that this challenge would, at most, go to the weight of Dr. Breuer's opinions. For one, Dr. Breuer's report demonstrates that several individuals associated with Defendant Keeley have claimed that their placement of safety barrels was permissible *at the time of the accident* (*see* Doc. 148-1 at pp. 15-17). Put simply, Dr. Breuer's expert opinion on the placement of safety barrels at the time of the accident is not impacted by the separate question of whether those safety barrels were initially placed in different, suitable locations. Moreover, a part of Dr. Breuer's opinion addresses the question of whether traffic surveillance should have noticed and fixed any barrels that may have shifted out of their original position (*Id.*). Consequently, while Defendant Keeley is free to question Dr. Breuer as to her knowledge of barrel placement at the end of the workday, those challenges would only impact the weight of some of her opinions. However, they by no means indicate that her testimony should be barred in its entirety for relying on insufficient data.

Defendant Keeley also argues that Dr. Breuer's opinions should be excluded because she lacks knowledge as to the underlying cause for the cutout extension (i.e., the manmade pothole referenced in the Complaint) (Doc. 148 at p. 12). The Court questions how Dr. Breuer's alleged lack of knowledge as to the underlying reasoning for the extension of the cutout impacts her opinions and testimony related to traffic safety. Certainly, if Dr. Breuer testifies to the need for the extension of the cutout from a construction standpoint, that is something Defendant Keeley could raise an objection to

at trial. But, as far as the Court can discern, the underlying reason for the extension of the cutout is not directly relevant to Dr. Breuer's opinions about traffic safety measures, and Defendant Keeley's attempt to conflate these two distinct issues is not persuasive.

For similar reasons, the Court rejects Defendant Keeley's argument that Dr. Breuer lacks knowledge to provide expert opinion as to the failure to inform the Illinois Department of Transportation about the cutout extension. Undoubtedly, if Defendant Keeley possesses evidence tending to demonstrate that the engineer in question was informed of the extension, they are free to use that evidence to challenge Dr. Breuer's opinion that there is no evidence the engineer was informed. However, at this time, Defendant Keeley has not shown that Defendant Breuer failed to rely on sufficient facts when reaching her conclusion that "[t]here is no evidence that Defendants informed the engineer nor received an inspection following the new saw cuts[.]" (Doc. 148-1 at p. 19).

For the reasons discussed above, the Court rejects Defendant Keeley's claim that Dr. Breuer's expert report and opinions are not supported by sufficient facts and data. Dr. Breuer's report denotes numerous sources underlying her opinions and conclusions (*see* Doc. 148-1 at pp. 4-5) and any further challenges may be raised on cross-examination.

   *c.   Methodology*

Defendant Keeley also avers that Dr. Breuer's opinions are not the product of reliable principles or methods (Doc. 148 at pp. 13-16). More specifically, Defendant Keeley challenges: (1) Dr. Breuer's use of photogrammetry to form her opinion as to the extension of the cutout; and (2) her failure to look at other factors that may have

contributed to the incident (*Id.*). The Court rejects both contentions and finds that Dr. Breuer reliably applied an acceptable methodology.

Dr. Breuer's report first describes the site and the accident (Doc. 148-1 at pp. 5-8). It then lays out the purpose and utility of temporary traffic control measures before discussing the hazard created by the extension of the cutout (*Id.* at pp. 8-14). Thereafter, Dr. Breuer references numerous resources and evidence discussing/specifying what temporary traffic control occurred in this case and what was required under the applicable plans and standards (*Id.* at pp. 14-21). Her report then outlines the responsibilities the Defendants failed to follow for proper temporary traffic control (*Id.* at pp. 21-25). Finally, her report lists seven findings related to the traffic hazard at issue and the failure to take appropriate actions to protect drivers from it (*Id.* at p. 26).

To the extent Defendant Keeley has even challenged Dr. Breuer's overall methodology, the Court is not persuaded. Dr. Breuer's report provides sufficient context, explains and relies on applicable standards and plans, and analyzes Defendant Keeley's alleged deviation from those requirements to reach her opinions. In other words, Dr. Breuer arrived at her opinions with appropriate soundness and care. *See Anderson v. Raymond Corp.*, 61 F.4th 505, 510 (7th Cir. 2023) ("At all times the correct inquiry focuses not on the ultimate correctness of the expert's conclusions, but rather on the soundness and care with which the expert arrived at her opinion.") (internal quotation marks and citations omitted).

Moreover, regarding the specific photogrammetry challenge Defendant Keeley has raised, the Court finds that such an approach was permissible because it satisfies the

reliability requirements specified in *Daubert*. *See Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (listing factors that, pursuant to *Daubert*, could be considered in assessing the reliability of expert testimony). Crucially, not only has photogrammetry become more precise as technology has advanced, but "photogrammetry itself has a long, recognized history of reliability in the scientific and judicial community." *Gecker as Tr. for Collins v. Menard, Inc.*, No. 16 CV 50153, 2019 WL 3778071, at *4 (N.D. Ill. Aug. 12, 2019). If Defendant Keeley seeks to raise any specific challenges to Dr. Breuer's measurements or methodology in using that technique, it can do so on cross-examination.

Additionally, the Court is not persuaded by Defendant Keeley's argument that Dr. Breuer's methodology was inadequate because she failed to use the same methodology to "determine Plaintiff's lane positioning" or "the width of other cutouts in the construction zone." (Doc. 148 at p. 14). If Defendant Keeley wanted an expert to opine on Plaintiff's lane positioning or the adequacy of temporary traffic controls for other cutouts in the area, it should have retained its own expert to conduct that analysis. The Court will not fault Dr. Breuer's methodology because she did not undertake a task she was not retained to perform. For the same reason, the Court rejects Defendant Keeley's argument that Dr. Breuer's methodology is flawed because she did not adequately consider the implications of Plaintiff Zhu's alleged speeding (*see* Doc. 148 at pp. 14-15). While Defendant Keeley is free to examine Dr. Breuer on the traffic safety implications of any alleged speeding, the absence of such discussion in her report does not demonstrate a flawed methodology or otherwise cast doubt upon her opinions related to traffic safety and barrel placement.

In conclusion, the Court finds that Dr. Breuer's opinions are the product of reliable principles and methods. Any further challenges to Dr. Breuer's methodology may be raised on cross-examination.

### d.  Dr. Breuer's Report is Relevant and Will Assist the Trier of Fact

Finally, Defendant Keeley argues that Dr. Breuer's opinions, report, and testimony should be excluded because they will not assist the trier of fact (Doc. 148 at pp. 16-17). In support of this contention, Defendant avers that Dr. Breuer's report and opinions are unreliable, provide little to no independent investigation, and can readily be observed through evidence in the record (and underlying standards and specifications cited therein) (*Id.*). The Court does not find any of these arguments convincing.

The Court need not rehash its prior finding that Dr. Breuer's methodology was reliable. It was. Likewise, that methodology demonstrates that Dr. Breuer provided ample independent investigation. In fact, the Court finds it curious that Defendant Keeley challenged Dr. Breuer's use of, among other things, photogrammetry, while also claiming that she provided no useful independent analysis. Regardless, the Court finds that Dr. Breuer's report and opinions rely upon useful, independent analysis of temporary traffic control standards and compliance. Moreover, contrary to Defendant Keeley's argument, the Court does not believe that the pictures and other evidence in the record adequately establish whether traffic control measures were appropriately followed. In addition, contrary to Defendant's assertions, such a topic is not within the purview of the average juror. *Arrington v. City of Chicago*, No. 17 C 04839, 2022 WL 2105871, at *5 (N.D. Ill. June 10, 2022) ("In cases involving complicated questions of accident causation—perhaps

involving more vehicles or unexpected mechanical behavior—accident reconstruction experts might provide valuable assistance in understanding what really 'caused' a crash."); *Davis v. Duran*, 277 F.R.D. 362, 366-67 (N.D. Ill. 2011) ("To be helpful, the testimony must concern a matter beyond the understanding of the average person."). In fact, this point is demonstrated by the discussion in Dr. Breuer's report which explains how at least two employees of the defendants believed the safety barrels were appropriately placed or did not need to be addressed (*see* Doc. 148-1 at p. 15).

Accordingly, the Court concludes that Dr. Breuer's opinions and testimony would be of assistance to the jury. In addition, Dr. Breuer's opinions are based on sufficient facts or data and were the product of reliable principles and methods. As a result, the Court DENIES Defendant Keeley's Motion to Exclude Expert Reports, Testimony and Opinions of Dr. Breuer (Doc. 148).

CONCLUSION

For the reasons discussed above, Defendant Keeley & Sons, Inc.'s *Daubert* Motions seeking to exclude the expert reports, testimony, and opinions of Michelle Albers (Doc. 145), Dr. Richard Bowman (Doc. 146), and Dr. Helena Breuer (Doc. 148) are **DENIED**. A Status Conference will be set by separate order to discuss trial scheduling and the utility of engaging in an additional mediation.

**IT IS SO ORDERED.**

**DATED: July 2, 2026**

MARK A. BEATTY
**United States Magistrate Judge**